340 P.2d 761

Richard H. HOLDER, Plaintiff and
Respondent,

v.

Ruth HOLDER, Defendant and Appellant.
No. 8984.
Supreme Court of Utah.
June 19, 1959.

Robert B. Hansen, Salt Lake City, for appellant.

Sumner J. Hatch, Salt Lake City, Ray S. McCarty, for respondent.

CROCKETT, Chief Justice.

Richard H. Holder sued Ruth R. Holder for annulment of marriage on the ground that she fraudulently induced him to enter it by representing that she was pregnant with his child. Defendant counterclaimed for divorce, alimony, support money for the infant child born August 13, 1957, and for other relief. The trial court found for the plaintiff. Defendant appeals.

Richard Holder, then 19 years of age, and Ruth who was 17 years of age and a junior in high school, had been "keeping company" and admit to acts of sexual intercourse for some time prior to May, 1956, when the plaintiff went to Alaska to work. Upon his return to the United States his parents were to meet him at Monterey, California, on December 24. By arrangement among the parties they took Ruth with them to visit their son. Plaintiff's father says that when he picked Ruth up, almost immediately after entering the car,

she said: "I told my mother that I was going to come home pregnant." Plaintiff's mother says she also knew of that statement. They nevertheless took Ruth to California with them and permitted the young couple to resort together without any effort to chaperone them. They had intercourse that night and on other occasions before returning to Utah on December 29, 1956. Ruth made statements about being pregnant and said that on January 7, she was given a Friedman test [1] which indicated that she was, urging Richard that he should marry her. After some reluctance and consultation with his parents, he agreed and the parties were married February 2, 1957. The baby was born on August 13, 1957. On January 22, 1958, the plaintiff commenced this action to annul the marriage.

Review of the judgment requires consideration of the nature of proof required to establish that a husband is not the father of a child born to his wife during coverture. At least as far back as the ancient Roman law, the rule has been quite general that a child born to a married woman is presumed to be the offspring of her husband and legitimate. This presumption is rooted in the realization of the importance of the integrity of the legally recognized family as the basic unit

1. A test, also called the "rabbit test," used for the determination of pregnancy.

Gray's Attorneys' Textbook of Medicine, Third Ed., Sec. 58.09.

of society. It was endowed with such sanctity that deviations therefrom resulted in severe sanctions both social and legal. In former times, under the common law, bearing a child out of wedlock visited disgrace not only upon the immediate parties and their families, but quite unreasoningly, extended to the innocent child and was actually intensified as to him by depriving him of practically all legal rights. It was said that he was legally related to no one; had no rights as an heir; was not even entitled to a name, although he could gain one by reputation; he was denied the privilege of aspiring to positions of dignity and honor in either church or state; he could have no heirs except those of his body; and if he died without descendants, his property escheated to the state.[2] It was to avoid the dire consequences to the child involved, as well as to protect the family unit, that courts have always gone to extreme lengths to hold issue legitimate,[3] and the presumption was practically absolute.[4]

It is to be appreciated that in modern times there exists at least a little more realistic attitude toward such misadventures and the stringent sanctions of the law have been relaxed to some degree. However, there still continues the illogical and unjust social stigma to the child, innocent of any wrong, or even of any voluntary involvement in the situation. It endures not only during his childhood, but throughout his life, and may even be visited upon his own children and beyond them. He is deprived of all of the benefits of a father and the legal right to support from him, leaving that responsibility to the mother, who is usually less able to provide for him. This and other important factors, including the preservation of the integrity of the family unit and harmony within it, provide the strongest considerations for favoring legitimacy and for discouraging litigation in such matters except in the clearest cases. For these reasons the presumption still remains one of the strongest known to the law. It can be rebutted only

2. See 7 Am.Jur., page 712.

3. See 7 Am.Jur., page 629 giving these examples: " * * * in the time of Edward II the Countess of Gloucester bore a child one year and seven months after the death of the Duke, and it was pronounced legitimate; and in the reign of Henry VI Mr. Baron Rolfe expressed the opinion with apparent gravity that a widow might give birth to a child seven years after her husband's death without injury to her reputation." It is to be observed that it might depend on what her reputation was.

4. 7 Am.Jur., page 636. The early common law rule in England was that if a wife had issue while her husband was within the jurisdiction of the King such issue was conclusively presumed to be legitimate, except upon proof of the husband's impotence; and even if he was beyond the realm, he must have been away for so long a period before the birth of the child as to make it a natural impossibility that he could be the father.

by showing that the husband was incapable of procreation or entirely absent and without access through the period during which the child must have been begotten, so that it was impossible for him to have been the father. And this must be proved with a high degree of certainty.[5]

While courts are uniform in adhering to the presumption, they are not so in their expressions as to the degree of proof required to overcome it. Quite a number of jurisdictions say that the proof must be "clear and convincing," or "clear and satisfactory," while others use language importing stronger requirements such as "cogent," "strong," "conclusive," or "irresistible."[6] In commenting on the standard of proof necessary Judge Cardozo in an oft-quoted opinion said, "What is meant by these pronouncements, * * * that the presumption will not fail unless common sense and reason are outraged by holding that it abides."[7] This is a good statement with which we are in accord. However, we observe that the standard it sets, in practical application, would probably not be at material variance with the familiar and practical rule favored by a number of respected authorities: that the presumption of legitimacy will prevail unless the contrary is proved beyond a reasonable doubt.[8] To the latter rule we give our approval.

The rule just recited appears to be about as close an approximation as can be stated as to what the courts usually do in actual practice and it applies a standard of proof which is commonly known and used. It also finds logical support in analogy to its use in the criminal law.[9] While proceedings such as here involved are in no sense criminal they nevertheless are concerned with accusations of wrongful conduct which, if proved, result in grave consequences. The considerations favoring legitimacy render it desirable as a matter of policy that the presumption should be accorded the same weight as the presumption of innocence.

It is sometimes said that the presumption of legitimacy is not so strong where the child was conceived prior to the marriage. This may find some support in reason if the husband does not know of

5. See In re Estate of Mills, 137 Cal. 298, 303, 70 P. 91, 93 citing an oft-quoted rule of Lord Langsdale which was stated in Hargrave v. Hargrave, 9 Beav. 552, 50 Eng.Reprint 457.

6. See Annotation, 128 A.L.R. 713; 9 Wigmore on Evidence, 3d Ed., Sec. 2527; 7 Am.Jur., page 656.

7. In re Findlay, 253 N.Y. 1, 170 N.E. 471, 473.

8. Gross v. Gross, Ky., 260 S.W.2d 655; In re Jones' Estate, 110 Vt. 438, 8 A. 2d 631, 128 A.L.R. 704; Sayles v. Sayles, 323 Mass. 66, 80 N.E.2d 21, 4 A.L.R.2d 564; 128 A.L.R. 713 and cases cited therein; this rule approved by American Law Institute, Model Code of Evidence, Rule 703; see note 33 Harv.L.Rev. 306 for documented note stating this is most desirable rule; In Wisconsin by statute, Wis.Stat. 328.39.

9. See 33 Harv.L.Rev. footnote 7 above.

the fact. We think the better rule is that followed by the majority of courts: that where the husband knows of the pregnancy the presumption applies with the same force even when the child was conceived before marriage.[10]

We are unable to view the evidence here as being of the character required to overcome the presumption that the child is that of the plaintiff. Except for a short gestation period, which we discuss below, the evidence in support of plaintiff's claim of non-paternity comes from him and his parents. It consists of statements they claim the defendant made about desiring to become pregnant when they left for California and that she "was pregnant" or "thought she was pregnant" after their return to Utah. Whatever view is taken of this evidence it is fraught with frailties.

The first thing to be kept in mind is the obvious bias these parents displayed in favor of their son and their animus against the defendant. In addition thereto there are other aspects of their story which cast doubt upon its probative value as to the issue involved. Their theory is that the defendant had set about to capture their son as a husband. It seems incredible that a 17-year-old girl, immediately upon entering the car for such a trip, would declare to a hoped-for father-in-law that she was "going to come home pregnant"; and

equally unlikely that with knowledge of such a declaration they would take her to California, leave her with their son unchaperoned on several occasions, and transport them back to Utah to further associate together. On the other hand, if they did so, their conduct is so contrary to what ordinary, decent people would do that it places them in such a light as to moral standards and moral judgment as to raise suspicion as to the story they might tell in their obviously over-protective interest for their son.

Furthermore, if the defendant made the declaration that she "was going to come home pregnant" and set about to do so (there is no dispute that plaintiff willingly cooperated), such facts would seem to argue at least as favorably to her claim that plaintiff was the father of her child as otherwise. This evidence provides small succor to plaintiff's cause. The same general characterization applies to their testimony as to other statements they claim defendant made about being pregnant after their return to Utah.

Another aspect of this case bearing on the credit to be given the testimony of the plaintiff and his parents are the circumstances of the marriage and the institution of this suit. The claimed statements about her desire to become, and being pregnant, are supposed to have been made prior to

10.  See Annotation 57 A.L.R.2d 733; 7 Am. Jur., p. 637; 10 C.J.S. Bastards § 3, p. 22; Cf. also Bement v. Bement, 110 Utah 451, 174 P.2d 996.

the marriage. With full knowledge thereof they all agreed that it should take place. The first indication that anything was said about fraud or misrepresentation was some time after the birth of the child on August 13, 1957. It was not until January 22, 1958, that this action was commenced to annul the marriage upon such grounds as, if proved, would disgrace everybody concerned and set in motion a chain reaction of distress the extent of which may be difficult to appreciate. At that late time to dig up the bones of the skeleton they had themselves long since acquiesced in burying by agreeing to the marriage does not enhance the virtue on the plaintiff's side of the controversy. The principal effect of their evidence and what they have accomplished in bringing the lawsuit is to besmirch the defendant with an accusation of moral delinquency to which they are all parties and to imbue themselves with such moral turpitude that a court of equity should be loathe to turn it to their advantage.

In appraising the value of the plaintiff's evidence it is also necessary to keep in mind the defendant's denials of the material accusations against her, together with other important facts: that she was a girl but 17 years of age and being dealt with by supposedly mature adults who might well have prevented the conduct they now censure, or at least have made some effort to do so; and that unlike most cases of questioned paternity, where there is usually some evidence of associations with one or more other men, the evidence here is devoid of any showing of that kind as to this defendant.

Evidence which is not suffused with animus or self-interest, and which merits serious analysis, is that relating to the period of gestation. The plaintiff had been in Alaska from May until December 24, 1956, when the parties met at Monterey, California. Thus the acts of intercourse prior to his departure are too remote to be of concern here. Accordingly, the period of gestation must be reckoned from December 24, 1956, the first possible date of fruitful coition, to August 13, 1957, the date of the birth of the child. This is 232 days, or 7⅔ months as compared with the normal "average" gestation period of 270 days, or nine months. The medical testimony is that a woman of defendant's physical characteristics may deliver a child earlier than the normal period. It also shows that the gestation period is subject to considerable variation, and that it was possible, though not probable, that the child here involved was the result of a gestation period of 7⅔ months.

For a discussion of the gestation period and the law applicable thereto see Dazey v. Dazey.[11] There the court, after citing authority that the gestation period "has

11. 50 Cal.App.2d 15, 122 P.2d 308, 310.

been found to vary from two hundred and twenty to three hundred and thirty days, the average being two hundred and seventy days," concluded that a fully developed child born 225 days after marriage was the legitimate child of the marriage. In a later California case [12] the court held that a fully developed child born 234 days after marriage was legitimate. No premarital intercourse was involved in either case. In Eldridge v. Eldridge [13] the court rejected a contention that birth of a child only 226 days after the husband's first meeting with the wife established that he was not the father of the child. The holdings in the cases just discussed are based on sound considerations of policy and social propriety.

Surveying the evidence here in the light of the authorities we have examined, it seems clear that the gestation period involved was not so short that the plaintiff could not have been the father of the child, but it is well within the limits of possibility that he was. Even if such evidence could be viewed as raising some doubt about the matter, it certainly does not amount to any substantial affirmative proof that he was not. As hereinbefore indicated, the other evidence in the case is of such questionable quality as to leave considerable doubt as to its veracity, and it has little probative value on the issue involved. As we appraise the whole evidence it could not reasonably be regarded as evidence of that credible and persuasive character which should be required to overcome the presumption that plaintiff was the father of the child.

The judgment is reversed and the cause remanded for further proceedings on defendant's counterclaim for divorce. Costs to appellant.

WADE and McDONOUGH, JJ., and MAURICE HARDING, District Judge, concur.

HENRIOD, J., concurs in result.

12. Gonzales v. Pacific Greyhound Lines, Cal.App. 202 P.2d 135; Cal., 209 P.2d 598; 34 Cal.2d 749, 214 P.2d 809.

13. Eldridge v. Eldridge, 153 Fla. 873, 16 So.2d 163.