In re J.W.F., Respondent,

v.

**Winfield SCHOOLCRAFT, Appellant.**

No. 870146–CA.

Court of Appeals of Utah.

Nov. 3, 1988.

---

Richard W. Jones (argued), Helgesen & Waterfall, Ogden, for appellant.

David L. Wilkinson, State Atty. Gen., Jane A. Marquardt (argued), Marquardt,

Hasenyager & Gusten, Ogden, for respondent.

Before DAVIDSON, JACKSON and GARFF, JJ.

## OPINION

GARFF, Judge:

Appellant, Winfield Schoolcraft, appeals an order of the juvenile court denying his petition for custody of a minor child, J.W.F. We affirm.

Appellant and Linda Schoolcraft, mother of J.W.F., were married on October 6, 1984 at Keyes, California. They lived together for approximately eight months after their marriage. Seven months to one year prior to J.W.F.'s birth,[1] Linda Schoolcraft left appellant. She gave birth to J.W.F. on November 5, 1985 in Ogden, Utah, and abandoned him on or about December 5, 1985.

A petition in the interest of J.W.F. was filed in the juvenile court on December 13, 1985, alleging neglect and abandonment by the parents, Michael Ford, the alleged natural father, and Linda Schoolcraft. The court appointed Jane Marquardt as guardian ad litem on December 24, 1985. On February 19, 1986, the court found J.W.F. to be neglected and abandoned, and placed his custody with the State Division of Family Services. Appellant, who was still married to Linda Schoolcraft but had been unaware of her pregnancy, found out about J.W.F.'s birth in August 1986, when he learned of the petition filed in juvenile court. J.W.F. was about nine months old at this time. Appellant filed a petition for custody on August 28, 1986, alleging that he was the "presumed father" because he was married to Linda Schoolcraft and was living with her at the time of conception.

A petition for permanent termination of the parental rights of Michael Ford and Linda Schoolcraft was filed on September 5, 1986. On December 16, 1986, because the guardian ad litem was convinced that appellant could not be the natural father of J.W.F., she filed a petition alleging that

---

1. The record is unclear as to the exact date on which Linda Schoolcraft left appellant.

appellant had no legal rights to J.W.F., or, alternatively, that he was an unfit parent or had abandoned the child, and, thus, should have his parental rights terminated. After a hearing on December 16, 1986, the court permanently deprived Michael Ford and Linda Schoolcraft of their parental rights, and continued appellant's petition to February 10, 1987.

On that date, the court entered a memorandum decision determining that appellant was not the father of J.W.F. and, therefore, had no legal rights to his custody. The child remained, instead, in the custody of the Division of Family Services for placement in a suitable adoptive home. The court did not determine whether appellant had abandoned the child or whether he was fit to retain parental rights.

Although most of the evidentiary hearing in the juvenile court was devoted to a factual determination as to whether appellant was the natural father of the child, appellant now concedes that he is not the natural father, but maintains he is the legal father. Appellant argues that the juvenile court lacked jurisdiction to hear this matter because the Uniform Act on Paternity specifically states, "The district court has jurisdiction of an action under this act." Utah Code Ann. § 78–45a–5 (1987). Appellant also argues that the guardian ad litem was not an interested party and had no standing to question the child's legitimacy and appellant's paternity. If the above arguments fail, the issue remains as to whether a man married to a woman, who bears a child conceived and born during the marriage, has any legal right to the custody of that child when that man is not the natural father.[2]

## JURISDICTION OF THE JUVENILE COURT.

■ Utah Code Ann. § 78–3a–16(1)(c)(i) (1985) gives the juvenile court exclusive, original jurisdiction in proceedings concerning any child who is neglected or dependent. A neglected child is defined, in part, as "[a] child whose parent ... has abandoned him or has subjected him to mistreatment or abuse." Utah Code Ann. § 78–3a–2(17) (1985). Utah Code Ann. § 78–3a–40(1) (1985) specifies that once the juvenile court obtains jurisdiction under Utah Code Ann. § 78–3a–39 (1985), the court's jurisdiction continues until the child becomes twenty-one years of age or unless jurisdiction is terminated sooner by court order. In the present case, the juvenile court asserted jurisdiction in December 1985, when the child was found to be abandoned, and placed custody with the State Division of Family Services pursuant to Utah Code Ann. § 78–3a–39(3) (1985).[3] The court continued its jurisdiction and subsequently held periodic reviews as required by Utah Code Ann. § 78–3a–39(19) (1985).

When appellant came forward and filed his petition for custody, asserting that he was the "presumed" father, he immediately raised the issue of paternity. The guardian ad litem took the position that appellant was neither the natural nor the legal father and, therefore, had no standing to request custody. Thus, it was under the aegis of this issue that the Uniform Act on Paternity procedures were invoked, but only for the purpose of determining if appellant was the natural father. The Act was not invoked for its primary purpose, to require appellant to pay expenses of pregnancy and child support. *See* Utah Code Ann. § 78–45a–5(1) (1977). In *Utah Department of Social Services v. Dick*, 684 P.2d 42 (Utah 1984), the Utah Supreme Court, in holding that jurisdiction of actions under the Uniform Act on Paternity is lodged in the district court, stated: " 'The district court has jurisdiction of an action under this act ....' Jurisdiction is thus lodged in

---

2. This unique issue is one of first impression. Ordinarily, a husband in this situation seeks to avoid responsibility for the child rather than attempt to acquire the obligation to support the child.

3. Section 78–3a–39 enumerates possible dispositional orders of the court once it has found the child to come within the jurisdictional provisions of Utah Code Ann. § 78–3a–16 (1985). Section 78–3a–39(3) states, "The court may vest legal custody of the child in the state division of family services ... for placement in a foster family home ...."

the district court, and the juvenile court has no power to enter an order *under the Act."* *Id.* at 42 (quoting Utah Code Ann. § 78–45a–5(1)) (1975)) (emphasis added). At no time did the juvenile court enter an order requiring appellant to pay maternity expenses or support under this Act, but the issue of paternity was incident to appellant's petition for custody.

> It seems to follow that if the mother ... is married to a man who is not the father of the child, and a divorce or annulment is later granted, the mother is entitled to custody and the husband is not entitled to custody. It is therefore evident that where either spouse petitions the divorce court for custody of the child, the legitimacy or paternity of the child may be the controlling fact; and the court has jurisdiction to decide paternity as an incident to the petition for custody.

65 A.L.R.2d 1386 (1959) (citing *Laumeier v. Laumeier*, 308 Mo. 201, 271 S.W. 481 (1925)). Appellant's paternity, either natural or legal, was an essential issue to be determined before the court could decide whether appellant was an interested party with standing to petition for custody.

Because the juvenile court had continuing jurisdiction, and the paternity issue was incident to and necessary for the resolution of appellant's petition for custody, we hold that the juvenile court had jurisdiction to determine whether appellant was the natural father of J.W.F.

## STANDING OF GUARDIAN AD LITEM

■ When a court presumes to consider the best interests of a child, especially when custody is at issue, it is crucial for that child to have party status. Additionally, it is critically important for him to have personal representation by counsel who has no other agenda than to determine what actually is in the best interest of that child. The court cannot do "complete justice" unless the child is recognized as a necessary, indispensable party to the proceeding. Justice Curtis made a classic statement on party status in *Shields v. Barrow*, 58 U.S. (17 How.) 130, 139, 15 L.Ed. 158 (1855) which is just as apropos now as in 1855:

> The court here points out three classes of parties to a bill in equity. They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.

The Utah State Legislature recognized this concept in the Juvenile Court Act when it provided for a guardian ad litem to represent the best interests of the child. Utah Code Ann. § 78–3a–44.5 (1987) states that:

> (1) The court may appoint a guardian ad litem to represent the best interests of a child involved in a case before the court. (2) The guardian ad litem shall investigate the case, especially as it affects the interests of the child, and present to the court an independent determination of what court action would be in the best interests of the child.... (3) The guardian ad litem shall continue to serve the child until released from his duties by the court.

Further, Utah Code Ann. § 78–3b–11 (1987) requires that "[i]n every case which results in a judicial proceeding involving an abused or neglected child, the court shall appoint a guardian ad litem to represent the child."

■ In this case, the guardian ad litem was appointed by the court to represent the best interests of J.W.F. and, thus, had a duty to investigate the case and present an

independent determination to the court of what those best interests might be.

> However, ... when a child needs a guardian ad litem, he needs an advocate —someone who will plead *his* cause as forcefully as the attorneys for each competing custody claimant plead theirs. The basic premise of the adversary system is that the best decision will be reached if each interested person has his case presented by counsel of unquestionably undivided loyalty. *There is no person more interested in a child custody dispute than the child.* His representative should act accordingly.

*Veazey v. Veazey,* 560 P.2d 382, 390 (Alaska 1977) (emphasis added). It is the guardian ad litem's duty to stand in the shoes of the child and to weigh the factors as the child would weigh them if his judgment were mature and he was not of tender years. *In re J.L.H.,* 647 S.W.2d 852, 860–61 (Mo.Ct.App.1983).

We conclude that J.W.F. was an interested, indispensable party in this proceeding and that the guardian ad litem, in representing J.W.F., had a responsibility as well as a right to raise the issue of appellant's paternity and his right to custody.

## PARENTAL RIGHTS OF APPELLANT

■ The unique issue now confronting us is the right a husband has to custody of a child when he, admittedly, is not the biological father of the child, but the child was conceived and born during his marriage to the mother. Appellant argued that J.W.F. was legitimate and, therefore, appellant is the legal father with all the rights the term "father" implies: rights that cannot be terminated without a showing of neglect or abandonment. The juvenile court, however, did not reach the question of neglect or abandonment, but, instead, appropriately decided the case on the threshold issue of paternity, determining that appellant had no parental rights of which to be deprived.

The guardian ad litem argued that, under the Paternity Act, the child was "born out of wedlock" and, thus, was illegitimate. Therefore, appellant had no parental rights. Appellant, in turn, argued that under the marriage statute, Utah Code Ann. § 30–1–17.2 (1971), "children born to the parties after the date of the marriage, [sic] shall be deemed the legitimate children of both of the parties for all purposes." Therefore, he had parental rights above all others since the mother's rights had been permanently terminated. However, the guardian ad litem argued that the statutory language, "children born to the parties," means that the husband, in a subsequent marriage to the mother, must also have been the natural father in order to make the child legitimate.

Since there are no cases specifically on point to offer some guidance, we extend the reasoning of two Utah Supreme Court cases, *Roods v. Roods,* 645 P.2d 640 (Utah 1982) and *Teece v. Teece,* 715 P.2d 106 (Utah 1986).

In *Roods,* appellant was the former husband of respondent. The parties divorced and respondent immediately remarried, giving birth to a child four months later, who had been conceived during her marriage to appellant. Appellant, however, contended that he was not the father and should not have to pay child support. The court disagreed, stating:

> Paternity, (who the father is) not legitimacy, (whether the child was either conceived or born in wedlock or both) is the issue of this case. Since birth and conception both occurred during marriage (albeit two separate marriages), the child, as stated earlier, is unquestionably legitimate; and the presumption of legitimacy prevailing unless the contrary is proved beyond a reasonable doubt does not apply.

*Roods,* 645 P.2d at 642.

The court held that appellant was the natural father and was obligated to support the child. *Id.* at 643. The fact that the second husband temporarily supported the child during the second marriage did not extinguish the natural father's responsibility for support. Thus, legitimacy did not determine the father's obligations to the child, but, rather, paternity did.

In *Teece,* the child was conceived and born during the marriage. The husband denied paternity. The supreme court stated:

> The principle that children born in wedlock are presumed to be legitimate is universally recognized. This presumption of legitimacy had it [sic] origins in English common law. While the presumption was originally rigid and arbitrary, it is now generally held that the presumption of legitimacy is rebuttable.

*Teece,* 715 P.2d at 107 (citations omitted).

In the present case, by conceding that he was not the biological father of J.W.F., appellant has effectively rebutted this presumption of legitimacy.

 In summary, biological fathers have the responsibility to support their children, whether born in or out of wedlock. Children born in wedlock are presumed to be legitimate, but this presumption is rebuttable. If rebutted, the non-biological father has no responsibilities toward the child. If that non-biological father has no responsibilities, then, as a corollary, he also has no rights with respect to that child, including custody rights. Therefore, because appellant is not the biological father and has rebutted the presumption of legitimacy, he has no right to custody of J.W.F. nor does he have any responsibility to support him. The decision of the juvenile court is affirmed.

DAVIDSON and JACKSON, JJ., concur.