**STATE of Utah in the Interest of J.W.F., a person under eighteen years of age.**

**Petition of Winfield D. SCHOOLCRAFT.**

**No. 890001.**

Supreme Court of Utah.

Oct. 19, 1990.

---

**26.** *Jarrell,* 608 P.2d at 224; *see also State v. Worthen,* 765 P.2d 839, 850 (Utah 1988); *State v.* *Carter,* 707 P.2d 656, 662 (Utah 1985).

Richard W. Jones, Ogden, for petitioner.

Martin W. Custen, Jane A. Marquardt, Ogden, for J.W.F.

R. Paul Van Dam, Sandra Sjogren, Paul M. Tinker, Diane Wilkins, Salt Lake City, for State of Utah.

ZIMMERMAN, Justice:

Winfield Schoolcraft seeks review of a decision of the court of appeals which held that the juvenile court acted correctly when it (i) determined that he has no parental rights in a child born to his wife during their marriage because he is not the biological father of the child and (ii) declined to hold a hearing to determine whether it would be in the best interests of the child, J.W.F., to place him in Schoolcraft's custody. We reverse the court of appeals' decision insofar as it indicates that Schoolcraft has no standing to petition for custody of J.W.F. and remand to the trial court for a hearing to determine whether it would be in the best interests of J.W.F. for Schoolcraft to have custody.

Winfield and Linda Schoolcraft were married on October 6, 1984. They lived together for approximately eight months after their marriage. The record is unclear as to the exact date on which Linda left Winfield, but it was seven months to one year prior to her giving birth to a son, J.W.F., in Utah on November 5, 1985. Linda abandoned J.W.F. on or about December 5, 1985.

A petition was filed by the State in the juvenile court on December 13, 1985, alleging neglect and abandonment by Michael Ford, the alleged natural father, and Linda Schoolcraft, the mother. The court appointed a lawyer, Jane Marquardt, as guardian ad litem on December 24, 1985. On February 19, 1986, the court found J.W.F. to be neglected and abandoned and placed him in the custody of the State Division of Family Services, where he has been ever since.

Winfield, who is still technically married to Linda, was living in California and was unaware of the pregnancy. He found out about J.W.F.'s birth in August of 1986, when he learned of the neglect and abandonment petition that had been filed by that state in juvenile court in 1985. J.W.F. was about nine months old at the time. Winfield then promptly filed a petition for custody in juvenile court on August 28, 1986, alleging that he was the presumed father because he was married to Linda and was living with her at the time of conception.

A petition for permanent termination of the parental rights of Michael Ford and Linda Schoolcraft was filed on September 5, 1986, and on December 16, 1986, the guardian ad litem filed another petition, alleging that Winfield Schoolcraft had no legal rights to J.W.F. This petition, seeking a determination that Winfield Schoolcraft had no rights in J.W.F., was based on an allegation by the guardian ad litem that Winfield was not the biological father of J.W.F. or, alternatively, that he was an unfit parent or had abandoned the child. After a hearing held on the two petitions, the court entered an order permanently depriving Michael Ford and Linda Schoolcraft of their parental rights. Both Winfield Schoolcraft's petition for custody and the guardian ad litem's petition to terminate Winfield's legal rights were continued to February 10, 1987.

On February 10th, the trial court entered a memorandum decision finding that Winfield Schoolcraft was not the biological father of J.W.F. and concluding that he had no right to custody. In essence, because Schoolcraft was not the child's natural father, the trial court denied Schoolcraft standing to assert a claim that it was in the child's best interests that he have custody. The court continued J.W.F.'s placement in the Utah State Division of Family Services for the purpose of finding suitable adoptive parents. Nothing in the record indicates that anyone is waiting to adopt J.W.F. at this time. The court of appeals affirmed the trial court's decision. We granted certiorari to review the court of appeals' decision.

The central question before us is what rights, including custodial rights, a husband has in a child born into his marriage who is not his biological offspring. Before addressing this question, several preliminary issues must be dealt with.

First, the court of appeals held that the trial court properly permitted the guardian ad litem to challenge the presumption that a child born during a marriage is the husband's natural child, relying on our decision

in *Teece v. Teece*, 715 P.2d 106, 107 (Utah 1986), and *Holder v. Holder*, 9 Utah 2d 163, 164–66, 340 P.2d 761, 762–63 (1959). The court of appeals reasoned that the guardian is the representative of the child and the child is an indispensible party to the proceeding with independent interests to assert. *In re J.W.F.*, 763 P.2d 1217, 1221 (Utah Ct.App.1988). Schoolcraft attacks this ruling. He argues that in order to preserve the sanctity of the marriage relationship, only the wife and the husband should be permitted to challenge the legitimacy of a child born into their marriage. If Schoolcraft is correct, then the trial court erred in permitting the guardian ad litem to challenge Schoolcraft's paternity and Schoolcraft is entitled to a legal presumption that he is J.W.F.'s father.

■ We find the court of appeals' analysis on this point to be too mechanistic and, consequently, is insufficiently sensitive to the legitimate policy considerations Schoolcraft raises. However, we find Schoolcraft's approach similarly flawed. We agree that, as a general matter, the class of persons permitted to challenge the presumption of paternity should be limited, as he argues, but we reject the notion that the legal status of the prospective challenger is the only relevant factor, as the court of appeals held. In determining who can challenge the presumption of legitimacy, a paramount consideration should be preserving the stability of the marriage and protecting children from disruptive and unnecessary attacks upon their paternity. *See Lopes v. Lopes*, 30 Utah 2d 393, 395, 518 P.2d 687, 689 (1974); *Holder v. Holder*, 9 Utah 2d at 165, 340 P.2d at 763. This leads us to conclude that whether individuals can challenge the presumption of legitimacy should depend not on their legal status alone, but on a case-by-case determination

of whether the above-stated policies would be undermined by permitting the challenge.[1]

■ Applying these criteria to the present case, we reach the same result as the court of appeals, albeit for different reasons. The guardian ad litem was representing the child, one not disinterested in the issue, because his custody, rather than his mere technical legitimacy, is at issue. Moreover, allowing the State or J.W.F. to challenge the presumption of legitimacy is not inconsistent with the relevant policy considerations. The stability of the marriage between Winfield and Linda Schoolcraft was shaken long ago, and their marriage is one in name only. Similarly, J.W.F.'s expectations as to who his father is cannot be shaken by permitting a challenge to the presumption of legitimacy. The child has never had a relationship with Schoolcraft, Michael Ford, or even his mother, so he has no expectations as to who his father is. Having considered the legal status of the challenger and the relevant policies that bear on the question, we conclude that the guardian ad litem was properly granted standing to challenge the presumption of legitimacy in this case.

A second claim Schoolcraft raises is that the court of appeals improperly found the presumption of legitimacy to have been rebutted in this case. In Utah, "the presumption of legitimacy will prevail unless the contrary is proved beyond a reasonable doubt." *Holder*, 9 Utah 2d at 166, 340 P.2d at 763. And, consistent with the historically strong policies that underlie that presumption, the form of proof admissible to rebut the presumption is limited. One of these limits that is part of our common law is "Lord Mansfield's rule."[2] As stated by this court, the rule is that "spouses themselves may not give testimony which would

1. Three Utah cases dealing with standing to challenge a child's legitimacy are consistent with this approach. In *Teece v. Teece*, 715 P.2d 106 (Utah 1986), *Roods v. Roods*, 645 P.2d 640 (Utah 1982), and *Lopes v. Lopes*, 30 Utah 2d 393, 518 P.2d 687 (1974), the court allowed both the husband and the wife to challenge the presumption of legitimacy, but in each of these cases, no reason existed to deny them standing because

the stability of their marriage had already been shaken.

2. *Goodright v. Moss*, 2 Cowp. 591, 98 Eng.Reprint 1257 (1777), wherein Lord Mansfield said: "[I]t is a rule founded in decency, morality, and policy that they [husband and wife] should not be permitted to say after marriage that the offspring is spurious."

tend to illegitimatize the child." *Lopes*, 30 Utah 2d at 395, 518 P.2d at 689. "[T]he proof of such facts where necessary [must] come from other sources." *Id.* at 396, 518 P.2d at 689.

In Utah, the legislature has not abrogated Lord Mansfield's rule, but has specified that certain nontraditional evidence is capable of conclusively rebutting the presumption of legitimacy. In *Teece v. Teece*, 715 P.2d 106, 107 (Utah 1986), the court observed that Lord Mansfield's rule has been substantially eroded by the enactment of section 78–25–18 of the code, which expressly mandates that courts utilize blood tests to assist in making a determination of paternity. Section 78–25–18 provides: "In any civil action or in bastardy proceedings in which the parentage of a person is a relevant fact, the court shall order the child and alleged parents to submit to blood tests." Utah Code Ann. § 78–25–18 (1987). Section 78–25–21 states: "The results of the [blood] tests shall be received in evidence where the conclusion of all examiners, as disclosed by the tests, is that the alleged father is not the actual father of the child, and the question of paternity shall be so resolved." Utah Code Ann. § 78–25–21 (1987 & Supp.1990).

The trial court found that it was scientifically impossible for Schoolcraft to be J.W.F.'s father based on blood tests and testimony by Dr. Charles DeWitt regarding the results of the blood tests. This is consistent with sections 78–25–18 and 78–25–21. The court also relied on the fact that J.W.F. is partly of African ancestry while Winfield and Linda Schoolcraft are both of Anglo–Saxon ancestry.

■ The court of appeals, however, affirmed the trial court's paternity finding on alternate grounds, i.e., Schoolcraft's concession on appeal that he is not the biological father of J.W.F. This was error because in relying on Schoolcraft's concession, the court relied on evidence that contravenes Lord Mansfield's rule.[3] This does

not mean that the presumption of legitimacy was not effectively rebutted, however. We conclude that the evidence before the trial court was sufficient to support its conclusion that the presumption of paternity was rebutted beyond a reasonable doubt. We therefore affirm that portion of the court of appeals' ruling for the reasons given by the trial court.

Having found that the guardian ad litem had standing to raise the issue and that the presumption of paternity was successfully rebutted, we next consider the question of whether Schoolcraft has any protectable custodial interest with respect to J.W.F., a child not biologically his, born to his wife during their marriage. Schoolcraft argues that he is J.W.F.'s legal father because of his relationship with Linda. Therefore, his parental rights, including his right to custody, cannot be terminated without a showing of unfitness. The court of appeals rejected this argument. It stated that once the presumption that a child born during a marriage is the husband's child is rebutted, the husband is not the child's legal father. In such a circumstance, the court of appeals reasoned, the husband has no financial obligation of support toward the child and therefore has no rights with respect to the child, including custodial rights. *In re J.W.F.*, 763 P.2d 1217, 1222 (Utah Ct.App. 1988).

■ Again, we find this analytical approach to be too mechanical. It may be that no one has the same rights toward a child as his or her parents. *See Wilson v. Family Services Div., Region Two*, 554 P.2d 227, 230 (Utah 1976). However, the fact that a person is not a child's natural or legal parent does not mean that he or she must stand as a total stranger to the child where custody is concerned. Certain people, because of their relationship to a child, are at least entitled to standing to seek a determination as to whether it would be in the best interests of the child for them to have custody. *See id.*

---

3. *See* Note, *J.W.F. v. Schoolcraft: The Husband's Rights to His Wife's Illegitimate Child Under Utah Law*, 1989 B.Y.U. L.Rev. 955, for a reflective and instructive analysis of court of appeals' decision.

■ We conclude that several factors may justify granting a person standing to petition for custody of a child. As the court of appeals noted, the legally enforceable financial obligations that a person has toward a child may suffice to give that person standing to seek custody. However, the grant of standing cannot be determined solely by reference to legal support obligations. Equally important is the person's status or relationship to the child. Even if a person has no legal duty of support to a child, that person's legal relationship to the child may suffice for standing. Examples include close relatives, who, although lacking a duty of support, may be perceived by reason of that relationship to have the child's best interests at heart. Such a relationship would seem to warrant a grant of standing.[4]

Our cases recognize the right of relatives other than parents to have standing to seek custody. In *Wilson v. Family Services Division, Region Two*, 554 P.2d 227 (Utah 1976), a grandmother sought to restrain family services from placing her grandchild, who was parentless, out for adoption until she could have a hearing on her own fitness as custodian and/or adoptive parent. The court stated that while only parents have vested rights to the custody of children, "next of kin, such as this grandmother, do have some dormant or inchoate right or interest in the custody and welfare of the children who become parentless, so that they may come forward and assert their claim." *Wilson*, 554 P.2d at 231. According to *Wilson*, inchoate rights entitle the relative to standing to such a hearing to determine custodial fitness.

■ A similar standing result obtained in a Utah divorce case, where this court held that a stepparent has the right to have a hearing to determine whether it is in the child's best interest to grant the stepparent visitation rights. *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978).[5] In a custody case, we stated that in "custody matters, all things else being equal, near relatives should generally be given preference over non-relatives." *In re Cooper*, 17 Utah 2d 296, 298, 410 P.2d 475, 476 (1966). And in yet another case, this court said that when determining the best interests of the child, a court may consider stepparent status. *Hutchison v. Hutchison*, 649 P.2d 38, 41 (Utah 1982).

■ Utah statutes also support the right of relatives other than parents to standing to seek custody. The legislature has allowed visitation rights for grandparents and other relatives. Section 30–5–2 of the code states that the court "may grant grandparents reasonable rights of visitation to grandchildren, if it is in the best interest of the grandchildren." Utah Code Ann. § 30–5–2 (1989). In addition, in divorce decrees, when "determining visitation rights of parents, grandparents, and other relatives, the court shall consider the welfare of the child." Utah Code Ann. § 30–3–5(4) (1989).

---

4. In addition, it is conceivable that persons who are not related by blood or marriage, although not presumptively entitled to standing, could show that they had a relationship with the child that would warrant a grant of standing. We have no such situation before us today.

5. The court in *Gribble* actually required that the stepparent stand in loco parentis to the child before he would be granted a hearing. The court was interpreting Utah Code Ann. § 30–3–5 (1953), as amended, which stated that, "visitation rights of parents, grandparents and other relatives shall take into consideration the welfare of the child." The court said that in order for a stepparent to get visitation rights, he must, therefore, "stand in the relationship of parent, grandparent, or other relative to this child." *Gribble*, 583 P.2d at 66. The court indicated that if Utah had a statutory provision obligating the stepparent to support the child, the stepparent would have the same status as a parent or at least a relative and would be entitled to a hearing on visitation. However, because no such statute existed at the time, the court required the stepparent to stand in loco parentis to the child.

Utah has since enacted the Uniform Civil Liability for Support Act, section 78–45–4.1, which requires a stepparent to support his or her spouse's children. *See* Utah Code Ann. § 78–45–4.1 (1987). According to the court's rationale, then, a stepparent, regardless of whether he or she stands in loco parentis to the child, is to be treated as a relative of the child and is entitled to a hearing to determine whether it would be in the best interests of the child to grant the stepparent visitation rights.

Based on the foregoing, we conclude that Schoolcraft has standing to seek custody of J.W.F. First, he is J.W.F.'s stepparent. A stepparent is defined as "a person ceremonially married to the child's natural or adoptive custodial parent who is not the child's natural or adoptive parent." Utah Code Ann. § 78–45–2(14) (Supp.1990). Our case law indicates that the stepparent relationship Schoolcraft shares with J.W.F. is sufficient to entitle him to a hearing on custody. *Hutchison*, 649 P.2d at 41; *see also Gribble*, 583 P.2d at 64.

In addition, Schoolcraft has the legal obligation of support that the court of appeals thought indispensible to confer standing. The court of appeals was incorrect when it said that Schoolcraft has no legal obligation to J.W.F. As a stepparent, Schoolcraft has the obligation to "support a stepchild to the same extent that a natural ... parent is required to support a child" so long as the stepparent's marriage to the natural parent continues. Utah Code Ann. § 78–45–4.1 (1987). In light of Schoolcraft's stepparent relationship with J.W.F. and his legal support obligation, we find dual grounds for granting him standing to seek a hearing on whether it would be in the best interests of J.W.F. for him to have custody.

There is no reason to narrowly restrict participation in custodial proceedings. Indeed, our case law and the legislature's pronouncements indicate that the interests of the child are best served when those interested in the child are permitted to assert that interest. The question of who should have custody of the child is too important to exclude participants on narrowly drawn technical grounds, as did the court of appeals. Those who have legal or personal connections with the child should not be precluded from being heard on best interests. Of course, granting Schoolcraft a hearing on best interests does not mean that he has any presumption of entitlement of custody. The court still must determine what custody arrangement would serve the best interests of J.W.F. and act accordingly. Utah Code Ann. § 78–3a–39(13)(b) (Supp.1990); *accord Kishpaugh v. Kishpaugh*, 745 P.2d 1248, 1250–51 (Utah 1987);

*Hutchison*, 649 P.2d at 40; *Gribble*, 583 P.2d at 66.

Schoolcraft raises two other issues: whether the presumption of paternity is irrebuttable and whether the juvenile court had jurisdiction to determine the issue of Schoolcraft's paternity. Both of these issues have been addressed adequately by the court of appeals and will not be discussed here. *In re J.W.F.*, 763 P.2d 1217, 1219–22 (Utah Ct.App.1988).

The court of appeals' decision is reversed insofar as it states that Schoolcraft has no standing to petition for custody of J.W.F. We remand for a hearing to determine whether it would be in the best interest of J.W.F. for Schoolcraft to have custody.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.