2006 UT App 128

**Kelly F. PEARSON, Petitioner and Appellant,**

v.

**Kimberlee Y. PEARSON, Respondent and Appellee.**

**Peter D. Thanos, Intervenor and Appellee.**

No. 20040677–CA.

Court of Appeals of Utah.

March 30, 2006.

Rehearing Denied May 19, 2006.

Paige Bigelow, Kruse Landa Maycock & Ricks LLC, Salt Lake City, for Appellant.

Steven H. Gunn, Ray Quinney & Nebeker, Kellie F. Williams, and Jarrod H. Jennings, Corporon Williams & Bradford, Salt Lake City, for Appellees.

Before Judges GREENWOOD, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Kelly F. Pearson (Father) appeals from the trial court's supplemental decree of divorce awarding joint legal custody of the minor child Z.P. to Kimberlee Y. Pearson (Mother) and intervenor Peter D. Thanos. We reverse.

## BACKGROUND

¶ 2 Father and Mother (collectively the Pearsons) married in 1992. In July 1997, the couple had their first child, N.P. In late 1998, Mother became pregnant again, and a second son, Z.P., was born in September 1999.

¶ 3 Unbeknownst to Father, Mother had been involved in a romantic relationship with Thanos beginning sometime in 1996. Mother believed from early on in her pregnancy with Z.P. that Thanos was Z.P.'s biological father. She informed Father about her affair with Thanos and her belief about Z.P.'s paternity in March 1999. Despite Mother's infidelity, the Pearsons stayed together in an attempt to make their marriage work. Father agreed to raise Z.P. as his own, and Mother agreed to treat Father as Z.P.'s natural fa-

ther. Z.P. was born in September 1999, and Father was named as Z.P.'s father on his birth certificate. Father and Mother raised Z.P. together until they separated in May 2000. After separation and until the trial court's custody determination, the Pearsons voluntarily shared physical custody of Z.P. on a fifty-fifty basis.[1]

¶ 4 Mother informed Thanos in January 1999 that she believed him to be Z.P.'s biological father. Thanos was unwilling to be known or recognized as the child's father and did not provide any monetary support toward Z.P.'s prenatal care or birth costs. Thanos acquiesced in Father's role as Z.P.'s father. From birth until about January 2001, the first sixteen months of Z.P.'s life, Thanos did not provide any care or support for Z.P. and only saw him about half a dozen times.

¶ 5 In December 2000, Father initiated divorce proceedings. Thanos moved to intervene in the proceedings in January 2001, claiming that he was Z.P.'s biological father. Concurrently, Mother denied Father's paternity of Z.P. in her answer and asked the trial court to declare that Father was not Z.P.'s biological father and that he had no rights of custody or visitation with Z.P. Father opposed both motions. The commissioner hearing the matter determined that Thanos lacked standing to contest Z.P.'s paternity.

¶ 6 Thanos and Mother objected to the commissioner's standing decision. The trial court determined that the issue was governed by *In re J.W.F.*, 799 P.2d 710 (Utah 1990), and that it needed additional information to adequately address the policy considerations set forth in that case. The trial court appointed Dr. Jill Sanders to provide the court with an independent *Schoolcraft* analysis.[2] Sanders was to address the second prong of the *Schoolcraft* test—whether permitting Thanos to seek paternity of Z.P.

1. Thanos and Mother married in July 2002, shortly after the trial court granted Mother's request to bifurcate this case and entered a decree of divorce between the Pearsons. Thanos and Mother subsequently had another child, daughter M.T., whose custody is not implicated in this case. Also, despite the relationship between Mother and Thanos prior to N.P.'s birth, there is no suggestion that Thanos is N.P.'s biological father.

2. The term *"Schoolcraft* analysis" refers to the analysis set forth in *In re J.W.F.*, 799 P.2d 710 (Utah 1990), and is named for the petitioner in that case. A *Schoolcraft* analysis determines a person's standing to challenge the presumption of legitimacy of a child born into a marriage, based primarily on two policy considerations: "preserving the stability of the marriage and protecting children from disruptive and unnecessary attacks upon their paternity." *Id.* at 713.

would be disruptive to Z.P.'s relationship with Father. She concluded that Thanos's presence in Z.P.'s life would not be inherently harmful to Z.P. or to Z.P.'s relationship with Father.

¶ 7 After considering Sanders's conclusions and the *Schoolcraft* factors, the trial court granted Thanos's motion to intervene in November 2002. Addressing the first prong of the *Schoolcraft* analysis, the trial court concluded that "the interest in preserving the stability of the [Pearsons'] marriage is not a consideration, due to the fact that there is no marriage to preserve. The stability was shattered when the parties separated and [Z.P.] was approximately nine months of age." As to the second prong, the court relied on Sanders's report to conclude that Thanos's challenge would not be "disruptive to Z.P. or an unnecessary attack on his paternity," and was "in the best interests of the child."

¶ 8 Father and Thanos both filed motions for summary judgment on the issue of Z.P.'s paternity. On May 8, 2003, the trial court granted Thanos's motion and denied Father's motion. The court's ruling determined Thanos to be the natural, biological, and legal father of Z.P.

¶ 9 The trial court issued its custody decision on May 11, 2004. Relying on its previous paternity determination, the court applied the parental presumption [3] in favor of Mother over Father as regards to Z.P. The trial court next determined that Thanos's parental presumption over Father had been rebutted, finding that for the first fifteen months of Z.P.'s life, Thanos "did not have a strong mutual bond" with Z.P., "did not demonstrate a willingness to sacrifice his own interests and welfare for [Z.P.], and generally lacked the sympathy for and understanding of [Z.P.] that is characteristic of parents generally." *See Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982) (listing factors for rebuttal of parental presumption). Accordingly, the trial court placed Father and Thanos on an equal footing and made its custody determination between them based solely on the best interests of Z.P. *See id.*

¶ 10 The trial court granted Mother and Thanos joint legal custody and primary physical custody of Z.P. Mother and Father were granted joint legal custody of N.P., with primary physical custody in Mother. Father was granted "joint physical custody time" with N.P. and Z.P. The boys rotated between households on a weekly basis, resulting in an approximately equal amount of physical custody in each household.

¶ 11 Father appeals from the trial court's order allowing Thanos to intervene, its grant of summary judgment to Thanos on the issue of Z.P.'s paternity, and its custody determinations to the extent that they relied on Thanos's paternity, and Father's non-paternity, of Z.P.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 12 Father raises multiple issues on appeal, but our decision rests on the question of Thanos's standing to challenge Z.P.'s paternity. Generally, a person's standing to request particular relief presents a question of law. *See Washington County Water Conservancy Dist. v. Morgan,* 2003 UT 58, ¶ 18, 82 P.3d 1125. To the extent that factual findings inform the issue of standing, " '[w]e review such factual determinations made by a trial court with deference.' " *Id.* (quoting *Kearns–Tribune Corp. v. Wilkinson,* 946 P.2d 372, 373–74 (Utah 1997)). " 'Because of the important policy considerations involved in granting or denying standing, we closely review trial court determinations of whether a given set of facts fits the legal requirements for standing, granting minimal discretion to the trial court.' " *Id.* (quoting *Kearns–Tribune Corp.,* 946 P.2d at 374).

## ANALYSIS

### I. The *Schoolcraft* Test

¶ 13 The trial court determined that, as of November 2002, Thanos's challenge to Z.P.'s paternity would not affect the stability of the Pearsons' failed marriage and would not constitute a disruptive and unnecessary attack

---

3. The parental presumption is "the presumption in favor of awarding custody to a natural parent over a nonparent." *Davis v. Davis,* 2001 UT App 225, ¶ 1, 29 P.3d 676.

on Z.P.'s paternity. *See In re J.W.F.*, 799 P.2d 710 (Utah 1990). Accordingly, the trial court found that Thanos had standing to challenge Z.P.'s paternity under the *Schoolcraft* test.

■ ¶ 14 While we do not necessarily disagree with the trial court's factual findings regarding the evolution of the relationships between Z.P. and the various parties, we determine that Thanos wholly lacked *Schoolcraft* standing for a substantial period of time prior to his establishment of a relationship with Z.P. Even with the breakup of the Pearsons' marriage and the development of a relationship between Z.P. and Thanos, we cannot agree with the trial court's conclusion that Thanos satisfied the *Schoolcraft* test by November 2002. *See id.* at 713. Accordingly, we determine that the trial court erred in allowing Thanos to intervene in this action.

### A. Preservation of the Stability of Marriage

¶ 15 The trial court found that "the first prong of the *Schoolcraft* analysis—relating to preserving the stability of the marriage—was not a consideration in this case, due to the fact that there was no marriage between [Father] and [Mother] to be preserved." Although we recognize that a divorce terminates any particular marriage and leaves nothing to preserve, we still disagree with the trial court's assumption that the first *Schoolcraft* prong loses all relevance upon divorce. Rather, we review the totality of the circumstances to determine whether a particular paternity challenge conflicts with the *policy goal* of preserving the stability of the marriage.

¶ 16 The trial court apparently relied on *In re J.W.F.*, 799 P.2d 710 (Utah 1990), to reach its finding that preservation of marriage becomes moot upon the divorce or separation of the parties. In that case, Winfield and Linda Schoolcraft were married in 1984 and lived together for approximately eight months before Linda left Winfield. *See id.* at 712. In November 1985, some seven months to a year after the parties separated, Linda gave birth to J.W.F. Linda abandoned J.W.F. shortly thereafter, and the State initiated abandonment proceedings in December 1985.

Upon learning of the child's birth and the abandonment proceedings in August 1986, Winfield filed a petition for custody of J.W.F., arguing that he was married to Linda and living with her at the time of conception. At this time, the parties had still not obtained a formal divorce. *See id.*

¶ 17 The standing issue in *In re J.W.F.* was whether a guardian ad litem could challenge Winfield's custody petition and presumed paternity of J.W.F. The supreme court noted that "the class of persons permitted to challenge the presumption of paternity should be limited." *Id.* at 713. The court then identified two "paramount consideration[s]" that must guide standing decisions in this context: "preserving the stability of the marriage and protecting children from disruptive and unnecessary attacks upon their paternity." *Id.* "[W]hether individuals can challenge the presumption of legitimacy should depend not on their legal status alone, but on a case-by-case determination of whether the above-stated policies would be undermined by permitting the challenge." *Id.*

¶ 18 In *In re J.W.F.*, the parties' long separation prior to the birth of J.W.F. led the supreme court to conclude that "[t]he stability of the marriage between Winfield and Linda Schoolcraft was shaken long ago, and their marriage is one in name only." *Id.* The supreme court permitted a challenge to Winfield's paternity in these circumstances, deeming it "not inconsistent" with the stated policy of preserving the stability of the marriage. *Id.* Notably, each of the three cases cited in *Schoolcraft* in support of this conclusion also involved situations where divorce or separation occurred prior to or nearly concurrent with the birth of the child. *See Teece v. Teece*, 715 P.2d 106, 106 (Utah 1986) ("In May of 1981, plaintiff gave birth to a child. Soon thereafter, she filed this action for divorce."); *Roods v. Roods*, 645 P.2d 640, 641 (Utah 1982) (addressing first husband's attempt to deny paternity where child was conceived during his marriage but born into a subsequent marriage between mother and another man); *Lopes v. Lopes*, 30 Utah 2d 393, 518 P.2d 687, 688 (1974) (addressing paternity question when child was yet "to be

born" at the time divorce pleadings were filed).

¶ 19 By contrast, the Pearsons made substantial efforts to maintain their marriage even though both parties knew midway through Z.P.'s gestation that Thanos was the likely biological father. The Pearsons disagree about their intent regarding Father's relationship to Z.P. Father contends that both he and Mother agreed that Father would raise Z.P. as his child in all respects, while Mother asserts only that she agreed to stay and try to make the marriage work so long as Father would not punish her or Z.P. for her infidelity. The trial court made no findings on the issue, but did find that the Pearsons did not separate until Z.P. was approximately nine months old.

¶ 20 While not dispositive of Thanos's standing, we determine that the Pearsons' efforts to maintain their marriage after Z.P.'s birth remain relevant to the *Schoolcraft* analysis, even post-divorce. The question is not whether the Pearsons' marriage ultimately failed, but rather whether the potential of a challenge to Z.P.'s paternity would have undermined the Pearsons' marriage while it was still in existence.[4] Under Father's version of events, the possibility of raising Z.P. as his own child without interference from Thanos was perhaps the central issue motivating him to make the marriage work. While Mother's version is substantially different, even her recollection indicates the importance of the issue to Father, and her own willingness to make the marriage work.

¶ 21 In any event, the Pearsons stayed together in marriage for over a year after Father first became aware of Thanos's paternity of Z.P. The trial court erred in failing to recognize that the Pearsons' shared parentage of Z.P. represented a stabilizing force in their then-existing marriage, and that the potential of a paternity challenge

would diminish that stabilizing effect. Thus, even after the Pearsons filed for divorce, Thanos's challenge to Z.P.'s paternity can be said to have had some undermining effect on the stability of the Pearsons' marriage within the meaning of *Schoolcraft's* public policy analysis.[5] While the reality of the Pearsons' ultimate divorce may minimize the importance of the first *Schoolcraft* prong, we cannot say on the facts of this case that it obviates that prong altogether.

### B. Protection of Children from Attacks on Paternity

¶ 22 The second, and in this case more problematic, policy consideration under the *Schoolcraft* test is "protecting children from disruptive and unnecessary attacks upon their paternity." *In re J.W.F.*, 799 P.2d 710, 713 (Utah 1990). There are crucial distinctions between the Pearsons' case and *In re J.W.F.* that lead us to conclude that Thanos's challenge to Z.P.'s paternity is both disruptive and unnecessary.

¶ 23 In *In re J.W.F.*, J.W.F. was promptly abandoned by his mother at birth, his natural father apparently never sought or enjoyed any parental role whatsoever, and his mother's husband, Winfield, never had custody of J.W.F. or a relationship with him. *See id.* at 712–13. J.W.F. was a little more than one year old at the time of the initial standing dispute. Not surprisingly, the supreme court had no trouble in determining that allowing J.W.F.'s guardian ad litem standing to litigate his paternity would not constitute an "unnecessary and disruptive attack[ ]" on J.W.F.'s paternity. *Id.* at 713. The court stated that "J.W.F.'s expectations as to who his father is cannot be shaken by permitting a challenge to the presumption of legitimacy. The child has never had a relationship with [Winfield] Schoolcraft, [or his biological fa-

---

4. We note that Thanos's paternity challenge arose entirely within the duration of the Pearsons' marriage, and that Thanos filed his motion to intervene concurrently with Mother's responsive pleading in the Pearsons' divorce case, prior to the actual decree of divorce.

5. We note that the public policy in favor of preserving the stability of marriage, always

strong in Utah, may be even stronger in light of Utah's enshrinement of so-called traditional marriage into its constitution in 2004. *See* Utah Const. art. I, § 29 (Supp.2005); *but see Citizens for Equal Prot. v. Bruning,* 368 F.Supp.2d 980 (D.Neb.2005) (declaring a similar state constitutional amendment invalid on various grounds including free association and equal protection).

ther], or even his mother, so he has no expectations as to who his father is." *Id.*

¶ 24 Clearly, the present case does not involve a lack of paternal relationships. Rather, the trial court was presented with an undisputed and ongoing paternal relationship between Father and Z.P., as well as Thanos's evolving relationship with Z.P. as a stepfather, and as the father of one of Z.P.'s siblings. In its November 2002 order granting Thanos's motion to intervene, the trial court explained its ultimate rationale on the unnecessary and disruptive prong:

> The court cannot find that granting Mr. Thanos the standing to intervene would be disruptive to [Z.P.] or an unnecessary attack on his paternity. In this case, as indicated by Dr. Sanders in her report, Mr. Thanos has an established relationship with the child and there is nothing in the reports of Dr. Sanders that would suggest allowing Mr. Thanos to intervene would be adverse to the best interests of the child. The report of Dr. Sanders, to the contrary, indicates that it is in the best interests of the child to allow Mr. Thanos to intervene.[6]

The November order also recognized that Father had "functioned as Z.P.'s father since his birth."

¶ 25 We have no reason to question the trial court's findings as they relate to the contents of Dr. Sanders's report or the existence of some relationship between Thanos and Z.P. in November 2002. However, despite the paternal role that Thanos may eventually have attempted to take, the undisputed facts of the case are that Thanos had little interest or involvement in Z.P.'s life until he was approximately sixteen months of age. The trial court recognized as much in its October 2001 order initially denying Thanos's motion to intervene: "Mr. Thanos was completely absent from [Z.P.'s] first year of life, was absent for the first half of his second year of life, and has had incidental contact during the second half of the second year of [Z.P.'s] life." As a result of this intentional absence, Z.P. developed a paternal relationship exclusively with Father over the first two years of his life, a relationship that both Father and Z.P. apparently continue to foster to the present.

¶ 26 The *Schoolcraft* analysis is not intended to protect children from all attacks on their paternity, but only those that are disruptive and unnecessary. *See id.* In evaluating the disruptiveness of a paternity challenge, the supreme court focused on the child's relationship with the existing father figure and the child's "expectations as to who his father is." *Id.* Here, the trial court found in its October 2001 order that Father was the "psychological father of [Z.P.]," that Z.P. had "become closely bonded with [Father]," and that those bonds were "critical." The trial court further found as a factual matter that to permit Thanos "to establish his paternity of [Z.P.] and to be introduced at this point as a father figure in [Z.P.'s] life would be immediately disruptive to the child's stability." These facts leave little doubt that, at least as of October 2001, Thanos's paternity challenge would have been disruptive to Z.P.'s existing paternal relationship with Father and Z.P.'s expectations as to who his father was.

¶ 27 We see nothing in the record to indicate that the mere passage of time, or the integration of Thanos into Z.P.'s life as Mother's husband, destroyed or even diminished Z.P.'s paternal relationship with Father or his expectations as to who his father was. To the contrary, Dr. Sanders's May 13, 2002 report found that "[Z.P.] identifies [Father] as his father and their attachment is secure, strong and healthy." Her supplemental re-

---

6. Dr. Sanders's May 13, 2002 report concluded that "[f]rom a developmental and psychological perspective, [Z.P.]'s functioning is not inherently disrupted by [Thanos's] involvement and [Thanos's] relationship with [Z.P.] is necessary to [Z.P.]'s normal and positive development." Dr. Sanders's supplemental report of August 26, 2002, further concluded that "[t]here is no reason to believe that further disruption to the relationship between [Z.P.] and [Father] is intrinsi-

cally linked to Mr. Thanos'[s] presence in [Z.P.]'s life."

Mere involvement or presence in a child's life is a very different thing than a legal challenge to the child's paternity. Thus, we do not see Dr. Sanders's reports as being responsive to the *Schoolcraft* goal of "protecting [Z.P.] from disruptive and unnecessary attacks *upon [his] paternity.*" *In re J.W.F.*, 799 P.2d at 713 (emphasis added).

port of August 26, 2002 confirmed that Z.P. and Father shared a "strong and positive parent-child attachment." Despite Dr. Sanders's other conclusions regarding Z.P.'s best interests,[7] her findings of a continuing paternal relationship between Z.P. and Father should have been the central focus of the trial court's *Schoolcraft* analysis.

¶ 28 In light of those findings, we cannot say that Thanos's attack on Z.P.'s paternity would not have been disruptive to Z.P.'s paternal relationship with Father and his expectations about whom his father was. The entire motivation for Thanos's attempt to intervene was to establish that he, rather than Father, was to fulfill the paternal role in Z.P.'s life. Whatever other effects Thanos's challenge might ultimately have on Z.P., his direct attack on Father's paternity of Z.P. certainly fails the *Schoolcraft* directive of avoiding disruption of *existing* paternal relationships.

¶ 29 We must also examine whether Thanos's paternity challenge can be deemed "necessary." *Id. In re J.W.F.* did not provide guidance on distinguishing between necessary and unnecessary paternity challenges, and the trial court did not expressly address the issue. We presume that, like the disruption element, the necessity element must be analyzed primarily from the child's perspective rather than from Father's or Thanos's. *See id.* (emphasizing a policy of "protecting children" and analyzing disruption from the child's perspective). We also assume, without deciding, that *Schoolcraft* standing always exists at birth and can be lost only thereafter. *Cf.* Utah Code Ann. § 78–30–4.14(2) (2002) (establishing standards by which unmarried biological father can establish paternity so as to defeat adoption of his child by another at birth).

¶ 30 Proceeding under these assumptions, we cannot see how Thanos's ability to challenge Z.P.'s paternity remained necessary

after he voluntarily absented himself from Z.P.'s life. From Z.P.'s perspective, he had a father in Father from his earliest ability to form paternal bonds. Had the Pearson marriage succeeded, Father would likely have remained Z.P.'s father in all regards throughout the foreseeable future. Dr. Sanders found that, even when the Pearsons' marriage failed, Z.P. continued to identify Father as his father and enjoy a strong paternal relationship with him. Thus, at the time of the trial court's intervention order, Z.P. had a father and was not in need of a different one.

¶ 31 We need not determine the exact point at which Thanos's paternity challenge became unnecessary for *Schoolcraft* purposes. It is sufficient in this case to determine that there existed a period of many months during which Z.P. developed a strong paternal relationship with a loving and willing presumed father. So long as that relationship continues, it cannot be said for *Schoolcraft* purposes that Z.P. has any particular need for his paternity to be established in another man.[8]

¶ 32 Looking at the circumstances of this case as a whole, we conclude that the trial court should have deemed Thanos's attack on Z.P.'s paternity both disruptive and unnecessary. Thanos's challenge to Z.P.'s presumed paternity became disruptive and unnecessary when he allowed Z.P. to form paternal bonds with Father, and will likely remain so, for *Schoolcraft* purposes, as long as those bonds continue.

### C. The Trial Court Erred in Allowing Thanos to Intervene

¶ 33 In light of our conclusions regarding the application of the *Schoolcraft* factors to this case, we determine that Thanos lacks standing to challenge Z.P.'s paternity and that the trial court erred by allowing him to intervene in the Pearsons' divorce action.

---

7. We are aware that disregarding Dr. Sanders's conclusions regarding Z.P.'s best interests seems counterintuitive given the central role that the best interests standard plays in every case involving juveniles. Nevertheless, in the context of determining standing to contest paternity, the *Schoolcraft* test is the standard set by the supreme court to measure the child's best interests

as those interests balance against the rights of others.

8. This is not inconsistent with Dr. Sanders's assessment that Thanos has a potentially valuable role to play in Z.P.'s life. That role, however, need not be as the primary father figure.

While the Pearsons' marriage may be long dissolved, we must give some weight to the fact that the Pearsons attempted to save their marriage, and that Father's intent and ability to raise Z.P. as his own were significant factors in that decision. Most significantly, however, an attack on Z.P.'s paternity at this point would be disruptive of Z.P.'s strong paternal relationship with Father, a relationship that renders Thanos's challenge unnecessary from Z.P.'s perspective. Under these circumstances, Thanos does not have *Schoolcraft* standing, and the trial court erred in allowing him to intervene.

¶ 34 We analogize Thanos's status to that of an unmarried father seeking to establish parental rights to his child in the face of the mother's intent to have the child adopted. *See* Utah Code Ann. § 78–30–4.14(2). Section 78–30–4.14(2) sets out various requirements that an unmarried biological father [9] must comply with in order to establish his paternity. *See id.* When the adoption involves a child under six months of age, section 78–30–4.14(2) establishes specific acts, including initiating a paternity action, that the father must take prior to the mother executing her consent to the adoption. *See id.* § 78–30–4.14(2)(b). The mother's consent to adoption can be executed as little as twenty-four hours after the child's birth. *See id.* § 78–30–4.19 (2002). A father who fails to comply with the requirements of section 78–30–14(2) has no standing to object to the adoption and permanently loses his parental rights to the child. *See id.* § 78–30–4.14(5); *In re adoption of B.B.D.*, 1999 UT 70, ¶¶ 10–12, 984 P.2d 967 ("Under Utah law, 'an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and upon the child's birth.'") (quoting Utah Code Ann. § 78–30–4.12(2)(e) (1996)).

¶ 35 By holding Thanos to a similar, if somewhat more generous, standard, we recognize that a husband is presumed to be the legal father of a child born into his marriage. *See* Utah Code Ann. § 30–1–17.2(2) (Supp.2005). In the vast majority of marital births, the husband is also the natural, biological father of the child. However, in the hopefully rare instance where a child born into a marriage is fathered by another man, the husband is nevertheless deemed the father of the child, with all concomitant rights and responsibilities, unless and until his paternity is successfully challenged under the Utah Uniform Parentage Act. *See id.* §§ 78–45g–101 to –902 (Supp.2005); *id.* § 30–1–17.2(4) ("A presumption of paternity established under this section may only be rebutted in accordance with Section 78–45g–607."). Essentially, an illegitimate child born into a marriage is immediately subject to a de facto adoption by the mother's husband. We see no reason why a man who chooses to procreate with the wife of another should be granted significant latitude to challenge the husband's de facto adoption, while one who fails to timely establish his paternity of a child born to an unmarried woman is permanently barred from doing so upon the mother's mere consent to the child's adoption.

¶ 36 Like any other unmarried father who fails to perfect his inchoate parental rights, Thanos lost his standing to contest Z.P.'s paternity sometime during the early months of Z.P.'s life. Despite the evolving circumstances of this case, we conclude that since that time Thanos has not met, and to our knowledge still does not meet, the *Schoolcraft* factors.[10] Accordingly, the trial court erred in granting Thanos's January 2001 motion to intervene and his subsequent motion for summary judgment establishing his paternity of Z.P.

## II. Z.P.'s Paternity and Custody

¶ 37 Our determination that it was error to allow Thanos to intervene in the Pearsons'

---

9. "Unmarried biological father" for purposes of Utah Code section 78–30–4.14(2) means a man not married to the child's mother, without regard to whether the man is married to another. *See* Utah Code Ann. § 78–30–4.11 (2002) (repealed 2005) (defining "unmarried biological father"); *id.* § 78–30–1.1(5) (Supp.2005) (same).

10. We express no opinion on the separate question of whether *Schoolcraft* standing, once lost, can ever be regained due to changed circumstances.

divorce action has inescapable consequences for the trial court's paternity and custody orders. With Thanos improperly joined in this litigation, the trial court's consideration of Thanos's motion for summary judgment to establish paternity, and the genetic evidence in support thereof, was error. And, of course, the court's May 2003 order granting Thanos's summary judgment on the issue of his fatherhood of Z.P. was also erroneous and is reversed.

¶ 38 With Thanos and all of his various pleadings and evidence out of the litigation, Father remains the presumed and legal father of Z.P. *See* Utah Code Ann. § 30–1–17.2(2). Accordingly, the trial court erred in applying the parental presumption in favor of Mother[11] and against Father in making its ultimate custody decision regarding Z.P. Other aspects of the trial court's supplemental decree of divorce also rely, explicitly or implicitly, on Thanos's paternity of Z.P., and these aspects of the final order are also erroneous and must be revisited as appropriate.

¶ 39 We reverse the trial court's orders below to the extent that they rely on Thanos's paternity of Z.P., and remand this matter to the trial court for the issuance of a new custody order, taking into account Father's legal paternity of Z.P.

## CONCLUSION

¶ 40 Thanos should not have been allowed to intervene in this matter due to a lack of *Schoolcraft* standing. Accordingly, the presumption of Father's legitimate parentage of Z.P. remains unrebutted, and Father remains the legal parent of Z.P. The trial court's supplemental decree of divorce, as well as any other order entered below, is reversed to the extent that it conflicts with Father's legal status as Z.P.'s parent or was premised on Thanos's paternity. This matter is remanded for further proceedings consistent with this opinion.

¶ 41 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge and GREGORY K. ORME, Judge.

---

11. We recognize that Mother asserted Father's non-paternity of Z.P. in her answer and in a simultaneous motion to show cause, and that she could have litigated Z.P.'s paternity on identical evidence in Thanos's absence. Regardless of this possibility, Z.P.'s paternity was actually litigated almost exclusively between Father and Thanos, an improper party. We rule today solely on the issues before us, and neither Mother nor Thanos argue on appeal that Mother's pleadings provide an independent ground to affirm the trial court's paternity finding.

More importantly, for all of the reasons set forth in this opinion, Mother would also appear to be barred from challenging Z.P.'s paternity on the facts and posture of this case. She too would lack *Schoolcraft* standing, *see In re J.W.F.*, 799 P.2d 710, 713 (Utah 1990), and her actions prior to the initiation of divorce proceedings might support a determination that her challenge was barred by equitable estoppel. *See Dahl Inv. Co. v. Hughes*, 2004 UT App 391, ¶ 14, 101 P.3d 830 (listing elements of equitable estoppel); *see also Kristen D. v. Stephen D.*, 280 A.D.2d 717, 719 N.Y.S.2d 771, 772–73 (2001) ("Courts have long recognized the availability of the doctrine of equitable estoppel as a defense in a paternity proceeding." (citations omitted)); *Richard W. v. Roberta Y.*, 240 A.D.2d 812, 658 N.Y.S.2d 506 (1997) (applying equitable estoppel principles to bar a paternity challenge). For the same reasons, Father would also appear to be barred from seeking to disestablish paternity of Z.P. should he ever choose to do so.

We express no opinion on whether Z.P. himself, the state of Utah, or any other person or entity could ever challenge Father's paternity, or the circumstances that might permit such a challenge.