2008 UT 24

**Kelly F. PEARSON, Plaintiff and Respondent,**

v.

**Kimberlee Y. PEARSON, Defendant and Petitioner.**

**Pete S. Thanos, Intervenor and Petitioner.**

No. 20060563.

Supreme Court of Utah.

March 18, 2008.

Paige Bigelow, Salt Lake City, for plaintiff.

Steven H. Gunn, Kellie F. Williams, Jarrod H. Jennings, Salt Lake City, for defendant and intervenor.

DURRANT, Justice:

## INTRODUCTION

¶ 1 Petitioner Pete Thanos ("Thanos") filed a motion to intervene in the divorce proceedings of petitioner Kimberlee Pearson ("Kimberlee") and respondent Kelly Pearson ("Kelly") in order to challenge the paternity of the Pearsons' son Z.P. The district court granted the motion, but the Utah Court of Appeals reversed, concluding that Thanos lacked standing based on our decision in *In re J.W.F. (Schoolcraft)*.[1]

¶ 2 We granted certiorari on three questions. First, whether the court of appeals erred in its interpretation and application of the *Schoolcraft* analysis set forth by this court. Second, whether the court of appeals inappropriately relied on the district court commissioner's recommendations. Third, whether the court of appeals erred in denying the petition for rehearing. We now affirm the court of appeals' decision as to all three issues before us.

## BACKGROUND

¶ 3 Z.P. was conceived and born into Kimberlee and Kelly Pearson's marriage as the result of an extramarital affair between Kimberlee and Pete Thanos. Although both Kelly and Thanos learned that Z.P. was the biological child of Thanos during the pregnancy, Kelly agreed to stay with Kimberlee and raise the child as his own. Kelly named Z.P. and was listed as Z.P.'s father on the birth certificate. Thanos spent time with Z.P. on two occasions during the first month of Z.P.'s life but did not see the child again until Z.P. was thirteen months old. Thanos claims that Kelly prevented him from seeing Z.P., but he admits that he did not want to assume direct support of Z.P. while he was married to another woman. Thus, Kelly assumed the role of Z.P.'s father.

¶ 4 Approximately nine months after Z.P.'s birth, Kimberlee and Kelly separated but continued to share equal custody and responsibility for Z.P. and their older son, N.P. After the Pearsons' separation and the death of Thanos's wife, Thanos began to see Z.P. and Kimberlee more frequently. When Z.P. was fifteen months old, Kelly filed for divorce. After the divorce became final, Thanos and Kimberlee married, and Kimberlee gave birth to another child fathered by Thanos.

¶ 5 One month after the Pearsons' divorce proceedings were initiated, Thanos filed a motion to intervene to establish his paternity of Z.P. Thanos's motion was initially heard by the district court commissioner, who recommended that it be denied. The commissioner found that given Thanos's limited contact with Z.P. during his first two years of life, Thanos's intervention would disrupt the father-son relationship between Kelly and Z.P. The district judge signed an order to that effect in October 2001, "subject to the objections which are pending."

¶ 6 The district court considered Thanos's objections to the commissioner's recommendation and concluded that the two-part *Schoolcraft* test governed whether Thanos should be granted standing to intervene. Under this test, courts assess the impact of a challenge to paternity in light of two policy considerations: (1) preserving the stability of the marriage and (2) protecting children from disruptive and unnecessary attacks on their paternity.[2] The district court concluded that granting intervention in this case would not violate the first part of the *Schoolcraft* test because there was "no marriage to preserve."

¶ 7 In order to evaluate the impact of the challenge under the second part of the test, the district court appointed Dr. Jill Sanders to conduct an independent *Schoolcraft* evaluation and give expert testimony on whether allowing Thanos to intervene would constitute a disruptive and unnecessary attack on Kelly's paternity of Z.P. Dr. Sanders concluded that the primary disruption in Z.P.'s

---

1. 799 P.2d 710 (Utah 1990).

2. *In re J.W.F,* 799 P.2d 710, 713 (Utah 1990).

life had already taken place when his parents separated and that Thanos's presence in Z.P.'s life was not disruptive but was in fact a necessary relationship that needed to continue. · Based substantially on Dr. Sanders's conclusions, the district court granted the motion to intervene. Subsequently, the district court recognized Thanos as Z.P.'s father and awarded joint legal custody of Z.P. to Thanos and Kimberlee, allowing Kelly third-party visitation rights.

¶ 8 Kelly appealed to the Utah Court of Appeals, which concluded that "Thanos's attack on Z.P.'s paternity [was] both disruptive and unnecessary" because Z.P. had formed paternal bonds with Kelly.[3] In reaching this conclusion, the court of appeals applied the *Schoolcraft* test and determined that "Thanos lack[ed] standing to challenge Z.P.'s paternity and that the district court erred by allowing him to intervene in the Pearsons' divorce action."[4] Because the court of appeals found that Thanos lacked standing to challenge Kelly's presumption of paternity, it held that Kelly remained Z.P.'s legal father.[5] The court reversed the custody order "to the extent that it conflicts with [Kelly's] legal status as Z.P.'s parent or it was premised on Thanos's paternity."[6] We granted certiorari and have jurisdiction pursuant to Utah Code section 78A–3–102(3)(a) (2008).

## STANDARD OF REVIEW

■ ¶ 9 On certiorari, we review the decision of the court of appeals for correctness, granting the court of appeals no deference.[7]

## ANALYSIS

¶ 10 We now affirm the court of appeals as to all issues. First, we hold that the court of appeals correctly applied the *Schoolcraft* test and properly denied Thanos's intervention.[8] Second, we hold that the court of appeals' reliance on the commissioner's recommendation was not outcome determinative and therefore not a basis for reversal. Third, we hold that the court of appeals properly denied the petition for rehearing, as its decision clearly precludes the district court from considering Thanos's biological paternity in determining custody. We will discuss each issue in turn.

## I. THE COURT OF APPEALS CORRECTLY APPLIED THE *SCHOOLCRAFT* TEST

■ ¶ 11 In *Schoolcraft,* we identified two policies that govern whether an individual has standing to challenge a presumption of paternity: (1) "preserving the stability of the marriage" and (2) "protecting children from disruptive and unnecessary attacks upon their paternity."[9] The policy of preserving the marriage extends not only to the preservation of spousal unity, but also to the preservation of parent-child relationships created by the marriage. Further, when a marital father has assumed parental responsibility for a child born into his marriage, and the father has established a father-child relationship, any challenge to the father's paternity

3. *Pearson v. Pearson,* 2006 UT App 128, ¶ 32, 134 P.3d 173.

4. *Id.* ¶ 33.

5. *Id.* ¶ 40.

6. *Id.*

7. *Beddoes v. Giffin,* 2007 UT 35, ¶ 4, 158 P.3d 1102.

8. Chief Justice Durham argues that we should not apply the common law analysis from *Schoolcraft,* but rather we should determine whether Thanos has standing by reference to the Uniform Parentage Act and its predecessor, the Uniform Act on Paternity. *Infra* ¶ 35. Because she concludes that the two acts are the same for the purpose of this question, she relies on the Uniform Parentage Act now in effect. Chief Justice Durham's dissent is problematic in that we were not asked and we did not consent to undertake certiorari review of the application of the Uniform Parentage Act to this case. Further, the parties neither argued nor briefed the issue. While we decline, for these reasons, to discuss the merits of the argument presented by Chief Justice Durham, we note that the 1965 Uniform Act on Paternity was effective at the time we issued our 1990 *Schoolcraft* case and that Act was, as the Chief Justice notes in her dissent, not substantively changed by the Uniform Parentage Act as to this issue. *Infra* ¶ 35; Utah Code Ann. §§ 78B–15–101 to –902 (2008); 1965 Utah Laws 582–84.

9. *In re J.W.F.,* 799 P.2d 710, 713 (Utah 1990).

is disruptive and unnecessary. Accordingly, we hold that granting Thanos standing to challenge Kelly's presumption of paternity would undermine the policies that the *Schoolcraft* test protects.

### A. The Policy of Preserving Marital Stability Extends to Parent–Child Relationships Created by the Marriage

¶ 12 In three previous cases, we have allowed challenges to a marital father's presumption of paternity but in circumstances much different than the case at hand. In *Schoolcraft,* we allowed a challenge to the presumption of paternity when the marital father had been separated from the mother for seven months to a year before she gave birth to a son, whom she soon abandoned. The marital father in *Schoolcraft* had no knowledge of the child's existence until nine months after his birth and had never developed a relationship with the child. When the marital father sought to assert his paternity at the abandonment proceedings, we allowed the guardian ad litem to challenge his presumption of paternity in part because the child had "never had a relationship with [the marital father]." [10]

¶ 13 In two other cases decided before *Schoolcraft,* we also allowed challenges to the presumption of paternity. In *Teece v. Teece,* [11] we allowed such a challenge because the marital father was in Canada at the time of conception, while his wife remained in the United States. [12] Further, the marital father refused to accept responsibility for his wife's child, and his wife filed for divorce soon after the child's birth. [13]

¶ 14 In *Lopes v. Lopes,* [14] we allowed a challenge to the marital father's presumption of paternity. In that case, the marital father filed for divorce while his wife was pregnant with the biological child of another man. [15]

¶ 15 In *Schoolcraft, Teece,* and *Lopes,* the marital father and mother were separated or had filed for divorce prior to or shortly after the birth of the child. [16] Moreover, in each case, there was no relationship between the child and the marital father. Therefore, we allowed challenges to the presumption of paternity.

¶ 16 The facts in this case are much different. Here, prior to the birth of Z.P., Kimberlee agreed that Kelly would be Z.P.'s father. After the birth, Kimberlee and Kelly remained married and took steps towards solidifying their relationship. During this period, Kelly accepted an equal share of the custody of and responsibility for Z.P. Kelly and Z.P. developed a strong father-son relationship that has continued following the dissolution of the Pearsons' marriage. The facts that Kimberlee and Kelly were married at the time of Z.P.'s birth and that Kelly assumed a paternal role following the birth distinguishes this case from any other that we have previously examined.

¶ 17 We agree with the court of appeals that preserving the marriage does not "[lose] all relevance upon divorce." [17] "[T]he Pearsons' efforts to maintain their marriage after Z.P.'s birth remain relevant to the *Schoolcraft* analysis, even post-divorce." [18] Indeed, the policy of encouraging the marital father to stay married to the child's mother and to assume parental responsibility for the child is not rendered irrelevant by the fact that this particular marriage ended in divorce. The parent-child relationships created by marriage last beyond the dissolution of the individual marriage. Recognition and protection of these relationships encourages the acceptance of parental responsibility and the formation of relationships between marital fathers and children who are born into their marriage. We have previously emphasized the importance of preserving family harmony

10. *Id.*

11. 715 P.2d 106 (Utah 1986).

12. *Id.* at 106.

13. *Id.*

14. 30 Utah 2d 393, 518 P.2d 687 (1974).

15. *Id.* at 688.

16. *See In re J.W.F.,* 799 P.2d at 712; *Teece,* 715 P.2d at 106; *Lopes,* 518 P.2d at 688.

17. *Pearson v. Pearson,* 2006 UT App 128, ¶ 15, 134 P.3d 173.

18. *Id.* ¶ 20.

between spouses as a policy consideration for favoring legitimacy.[19] Favoring legitimacy also promotes family harmony between parents and children by protecting and preserving these crucial relationships. Therefore, we interpret the first part of the *Schoolcraft* test broadly to encourage the development of these parent-child relationships and to protect them once they have developed.

¶ 18 Furthermore, a marital father should not be exposed to attacks on his paternity after voluntarily assuming parental responsibilities for a child conceived outside of the marriage. When a marital father is committed to raising a child born into the marriage and actively assumes the role of father following the child's birth, any challenge to paternity runs afoul of the first part of the *Schoolcraft* test because it undermines the preservation of marital stability.

¶ 19 After Kelly committed to raise Z.P. as his son, he fulfilled that commitment by acting as a father to Z.P. during the first years of his life. Moreover, the Pearsons continued to raise Z.P. together after their separation, maintaining the same parent-child relationships that existed during their marriage. Because the Pearsons' marriage was intact when Z.P. was born and Kelly, as a marital father, voluntarily assumed parental responsibility for Z.P., the presumption of paternity cannot be challenged in this case.

B.  *When a Marital Father Has Voluntarily Assumed Parental Responsibilities and Has Established a Father–Child Relationship, Any Challenge to His Presumption of Paternity Is Disruptive and Unnecessary*

¶ 20 In *Schoolcraft*, we held that granting the guardian ad litem standing to challenge the presumption of paternity was not disruptive to any father-child relationship because the child in that case had no relationship with either his mother's husband or his biological father, and thus the child had "no expectations as to who his father [was]."[20]

¶ 21 In *Teece* and *Lopes*, the children who were the subject of the paternity challenge did not have relationships with the fathers into whose marriages they were born. In *Teece*, the marital father refused to accept responsibility for his wife's child and consequently did not develop a parental relationship with the child. In *Lopes*, the child was not born at the time the marital father initiated divorce proceedings and the presumption of paternity was challenged, so no father-child relationship had developed.

¶ 22 In this case, Z.P. has established a relationship with Kelly and recognizes him as his father. Kelly is listed as Z.P.'s father on his birth certificate. Kimberlee treated Kelly as Z.P.'s father for at least the first sixteen months of Z.P.'s life, even after the couple had separated. Kelly developed a strong father-son relationship with Z.P. during the marriage that has continued beyond the Pearsons' divorce.

¶ 23 On the other hand, Thanos had very little contact with Z.P. during the first years of his life and did not develop a relationship with Z.P. until Kimberlee and Kelly had separated. Z.P. views Thanos as an "additional caregiver," while he considers Kelly to be his father.

¶ 24 In assessing the disruptiveness of a challenge to Z.P.'s paternity, the district court relied heavily on the findings of the custody evaluator, Dr. Sanders. Dr. Sanders's report stressed the importance of Z.P.'s relationship with both Thanos and Kelly but never specifically concluded whether it would be disruptive for Thanos to displace Kelly as Z.P.'s recognized legal father. The district court erred when it used Dr. Sanders's finding that Thanos's *presence* in Z.P.'s life was not disruptive to support its conclusion that Thanos's *challenge to Kelly's paternity* would not be disruptive. Thus, the district court misapplied the *Schoolcraft* test to Dr. Sanders's findings.

¶ 25 While parties interested in the well-being of a child may be entitled in certain cases to some third-party access, a child can have only one legal father. As the court of appeals recognized, "The entire motivation for Thanos's attempt to intervene was to

**19.** *Holder v. Holder,* 9 Utah 2d 163, 340 P.2d 761, 763 (1959).

**20.** *In re J.W.F.,* 799 P.2d at 713.

establish that he, rather than [Kelly], was to fulfill the paternal role in Z.P.'s life." [21] We agree with the court of appeals that Dr. Sanders's report was not "responsive" to the question of whether a challenge to Z.P.'s paternity would be disruptive and unnecessary.[22] Although Thanos's relationship with Z.P. is beneficial, a challenge to Kelly's paternity of Z.P. is disruptive in light of Z.P.'s established expectation as to the identity of his father.

¶ 26 Because Kelly voluntarily assumed parental responsibility for Z.P. during the course of Kimberlee and Kelly's marriage and established a father-son relationship with Z.P., any challenge to Kelly's paternity is disruptive and unnecessary.

## II. THE COURT OF APPEALS' RELIANCE ON THE COMMISSIONER'S RECOMMENDATION WAS INCONSEQUENTIAL BECAUSE IT WAS NOT OUTCOME DETERMINATIVE

■ ¶ 27 The court of appeals' decision referred to the commissioner's vacated recommendation several times. The petitioners argue that those references to the recommendation resulted in confusion when the matter was adjudicated in the court of appeals and that the references were critical to the court of appeals' conclusions. But none of the court of appeals' references to the commissioner's October 2001 order were outcome determinative, and therefore the references are not a basis for reversal.

¶ 28 The court of appeals' decision mentioned the commissioner's factual finding that "Mr. Thanos was completely absent from Z.P.'s first year of life, was absent for the first half of his second year of life, and has had incidental contact during the second half of the second year of Z.P.'s life." [23] It also referred to the commissioner's finding "that [Kelly] was the psychological father of Z.P., that Z.P. had become closely bonded with [Kelly], and that those bonds were critical." [24] Although the district court did not specifical-

ly cite these facts when it granted Thanos's motion to intervene, the facts were undisputed by the parties and were mentioned in Dr. Sanders's report, which the district court relied on in its findings of fact. The district court found that Thanos "had ongoing contact with the child commencing February 2001," implying that contact was limited prior to that date. The district court also found that Kelly "has functioned as Z.P.'s father since his birth," and that maintaining Z.P.'s relationship with Kelly was necessary to "protect Z.P. from additional disruption." Although the court of appeals quoted the commissioner's recommendation rather than the findings of fact from the district court, the commissioner's findings do not vary significantly from the actual findings of the district court. Because the court of appeals relied on the factual findings of the district court, these references to the commissioner's recommendation by the court of appeals are not significant.

¶ 29 The court of appeals' decision also cites the commissioner's conclusion that allowing Thanos "to establish his paternity of Z.P. and to be introduced at this point as a father figure in Z.P.'s life would be immediately disruptive." [25] We have held that as a matter of law, when a marital father has voluntarily assumed parental responsibilities and has established a father-child relationship, any challenge to the presumption of paternity is disruptive and unnecessary. Therefore, the court of appeals applied the correct test to the underlying factual findings and arrived at the proper legal conclusion.

¶ 30 Accordingly, the court of appeals' reliance on the commissioner's recommendation was inconsequential because it did not rely on the conclusions reached by the commissioner, but rather applied the *Schoolcraft* test to the factual findings of the district court and independently arrived at the same legal conclusion that the commissioner recommended.

---

21. *Pearson*, 2006 UT App 128, ¶ 28, 134 P.3d 173.

22. *Id.* ¶ 24 n. 6.

23. *Id.* ¶ 25 (internal quotation marks omitted).

24. *Id.* ¶ 26 (internal quotation marks omitted).

25. *Id.* (internal quotation marks omitted).

## III. THE COURT OF APPEALS CORRECTLY DENIED THANOS'S PETITION FOR REHEARING

¶ 31 The petitioners argue that the court of appeals' opinion was ambiguous in holding that "aspects" of the final custody order that "rely, explicitly or implicitly, on Thanos's paternity of Z.P." must be "revisited as appropriate."[26] This statement clearly precludes any consideration of biology in fashioning a custody award in this case. Kelly is the legal father of Z.P. Therefore, consideration of Thanos's biological paternity of Z.P. is irrelevant to awarding custody. While we have used kinship to determine custody rights in cases involving nonparents and included it in a list of factors to consider when determining the best interests of the child,[27] we have only applied it to weigh competing claims of nonparents or when the presumption of paternity has been rebutted.[28] In considering the importance of kinship, we have held that "the parents of a child are the only ones with a direct and vested right to [the child's] custody," but that other kin "have some inchoate right or interest in the custody and welfare of children who become parentless."[29] In this case, Thanos lacks standing to challenge Kelly's presumption of paternity. Therefore, Kelly is entitled to all of the rights as Z.P.'s legal father, and Thanos's biological paternity of Z.P. would only be taken into consideration if Z.P. becomes parentless.

### CONCLUSION

¶ 32 We hold that the court of appeals correctly applied the *Schoolcraft* test to Thanos's challenge to Kelly's presumption of paternity. Such a challenge to the presumption of paternity of a marital father undermines the policy of preserving the stability of marriage when it interferes with parent-child relationships established during the marriage. We also hold that such a challenge is disruptive and unnecessary where a committed and caring marital father has established a relationship with a child born into his marriage. Finally, we hold that the court of appeals' reliance on the commissioner's recommendation is not a basis for reversal and that the court of appeals properly denied the petition for rehearing. We therefore affirm the court of appeals' decision in every respect.

¶ 33 Justice PARRISH and Judge McVEY concur in Justice DURRANT'S opinion.

¶ 34 Having disqualified himself, Associate Chief Justice WILKINS does not participate herein; District Judge SAMUEL D. McVEY sat.

NEHRING, Justice, concurring:

¶ 35 I concur in the opinion of Justice Durrant. I write separately to make clear that we do not today decide that the Uniform Parentage Act, Utah Code Ann. § 78B–15–101 to –902 (2008), is irrelevant to this case. The parties elected to adjudicate Mr. Thanos's claim to standing under the common law, and I am content with a ruling that confines itself to an application of the common law standards announced in *Schoolcraft. In re J.W.F. (Schoolcraft)*, 799 P.2d 710 (Utah 1990). Like the Chief Justice, I believe that the Act and *Schoolcraft* occupy much of the same legal terrain. I believe it unwise, however, to examine in this case whether they can occupy their common space in harmony. The Chief Justice says that they cannot, that their respective policy aims and rationales conflict, and that we should defer to the legislative pronouncements on parentage as expressed in the Act. She may be right on both counts. It is with some regret, then, that I conclude that we should not, as the court of last resort, be the first forum to consider whether the Act and not *Schoolcraft* controls the fate of Mr. Thanos's quest for standing.

¶ 36 We have, in my judgment, raised dramatically the bar that a person in Mr. Thanos's position must surmount to gain standing by expanding the range of activities that

26. *Id.* ¶ 38.

27. *Hutchison v. Hutchison*, 649 P.2d 38, 41 (Utah 1982).

28. *See In re Cooper*, 17 Utah 2d 296, 410 P.2d 475, 475 (1966).

29. *Wilson v. Family Servs. Div.*, 554 P.2d 227, 231 (Utah 1976).

potentially subvert the *Schoolcraft* policy of "preserving the stability of the marriage." *Id.* at 713. Were the Act not part of Utah law, I would not be troubled by our heightened sensitivity to the importance of this goal. With the Act in place, however, we are in this case endorsing a significant development in the common law that may endure only long enough for litigants to properly stage a show-down between the common law and statutory approaches to determining standing in parentage cases.

¶ 37 While I express no opinion concerning whether the preclusive effect of this ruling would prohibit Mr. Thanos from being one of those litigants, I note that Z.P. might have standing as a litigant. This is because the Act both grants standing to a child in parentage adjudications and binds him or her by a determination of parentage made in a divorce action only if the issue of paternity is adjudicated under the provisions of the Act. Utah Code Ann. § 78B–15–623. Thus, for better or for worse, we may not have seen the last of this matter.

DURHAM, Chief Justice, dissenting:

¶ 38 I respectfully dissent. The parties originally framed the issues in this case in common law terms, and the questions we accepted for review on certiorari were likewise tied to our common law in the area of paternity. In my consideration of these questions, however, I have become persuaded that the legislature has spoken extensively about these questions, first in the Uniform Act on Paternity in effect at the time of the underlying factual events, and then in the Uniform Parentage Act that became effective in 2005 prior to the issuance of the opinion of the court of appeals. Thus, I believe that it is proper for this court to revisit the common law analysis we undertook in the *Schoolcraft* case, which was decided nearly twenty years ago. In the judicial analytic hierarchy, questions should be resolved with statutory answers prior to recourse to either common law solutions or constitutional review. Where the legislature has expressed public policy, particularly in the family law area, I believe that we should look first to that statutory policy, rather than relying on old common

law precedent that predates the statutes, notwithstanding the parties' failure in this instance to frame the issues in statutory terms. Thus, rather than relying on *Schoolcraft*, I undertake the following analysis based on the legislative scheme governing paternity in the state of Utah.

¶ 39 As mentioned above, the Uniform Act on Paternity was in effect from 1965 until 2005, when the legislature passed the Uniform Parentage Act. Although there are many differences between their provisions, my analysis of the effect of the two statutes on the questions raised in this case persuades me that the result under either would be the same. For precedential purposes, therefore, it makes sense to me to apply the policy contained in the current statute, the Uniform Parentage Act (the Act), and to resolve this case pursuant to its provisions.

¶ 40 The Act defines a "[p]resumed father" as "a man who, by operation of law under section 78B–15–204, is recognized as the father of a child until that status is rebutted or confirmed as set forth in this chapter." Utah Code Ann. § 78B–15–102(20) (2008). Section 78B–15–204 contains the following presumption of paternity: "(1) A man is presumed to be the father of a child if: (a) he and the mother of the child are married to each other and the child is born during the marriage...." *Id.* § 78B–15–201(1). Subsection (2) of the same section provides that "[a] presumption of paternity established under this section may only be rebutted in accordance with section 78B–15–607." *Id.* § 78B–15–204(2).

¶ 41 The referenced section, section 78B–15–607, is contained in Part 6 of the Act, dealing with "Adjudication of Parentage." Section 602 of that part deals specifically with the question of standing, and says in part that "a proceeding to adjudicate parentage may be maintained by ... (3) a man whose paternity of the child is to be adjudicated...." *Id.* § 78B–15–602. Section 78B–15–607(3) provides that "[t]he presumption may be rebutted by: (a) genetic test results that exclude the presumed father." *Id.* § 78B–15–601(3).

¶ 42 Neither the original presumption nor the rebuttal thereof by genetic testing is the

end of the matter under the Act, however. The next section, section 78B–15–608, gives the district court the specific authority to "disregard genetic test results that exclude the presumed ... father if the tribunal determines that: (a) the conduct of the mother or the presumed ... father estops that party from denying parentage; and (b) it would be inequitable to disrupt the father-child relationship between the child and the presumed ... father." *Id.* § 78B–15–608. In this case, the presumed father does not in fact deny parentage, so the predicate for the first finding exists, and the equitable assessment becomes relevant. The statute goes on to list a lengthy series of factors that the district court should consider in performing that assessment:

> (2) In determining whether to deny a motion seeking an order to ... disregard genetic test results under this section, the tribunal shall consider the best interest of the child, including the following factors:
>
> > (a) the length of time between the proceeding to adjudicate parentage and the time that the presumed ... father was placed on notice that he might not be the genetic father;
> >
> > (b) the length of time during which the presumed ... father has assumed the role of father of the child;
> >
> > (c) the facts surrounding the presumed ... father's discovery of his possible nonpaternity;
> >
> > (d) the nature of the relationship between the child and the presumed ... father;
> >
> > (e) the age of the child;
> >
> > (f) the harm that may result to the child if presumed ... paternity is successfully disestablished;
> >
> > (g) the nature of the relationship between the child and any alleged father;
> >
> > (h) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a

> child-support obligation in favor of the child; and
>
> > (i) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed ... father or the chance of other harm to the child.
>
> (3) If the tribunal denies a motion seeking an order for genetic testing or disregards genetic test results that exclude the presumed ... father, it shall issue an order adjudicating the presumed ... father to be the father of the child.

*Id.*

¶ 43 The statute also contemplates several procedural approaches relevant to this case. Section 78B–15–610(1) specifically provides that adjudication of parentage may take place in proceedings for divorce as well as "for adoption, termination of parental rights, child custody or visitation, child support, ... annulment, legal separation or separate maintenance, probate or administration of an estate, or other appropriate proceeding." *Id.* § 78B–15–610(1). And, section 78B–15–612(2) authorizes the district court to appoint a guardian ad litem to represent the child if it finds that "the interests of the child are not adequately represented." *Id.* § 78B–15–610(1).

¶ 44 From the foregoing provisions, I take several important policy directives from the legislature: (1) the historic common law presumption in favor of the legitimacy of children born within marriage has been preserved, but is no longer absolute; (2) putative biological fathers whose rights have not been terminated, legally waived, or cut off by an event such as adoption, have standing to seek to rebut the presumption of marital paternity by proof of genetic fatherhood;[1] (3) district courts have broad equitable powers to resolve paternity questions, regardless of either the marital presumption or the genetic test results, based on the best interest of the child.[2]

---

**1.** I note that the Act's approach to this problem obviates constitutional difficulties that may arise when biological fathers are denied an opportunity to be heard on paternity questions.

**2.** These equitable powers may apply both to the adjudication of parentage question and to other issues like visitation, in my view.

¶ 45 Applying these policy directives to this case, I would abandon the *Schoolcraft* analysis and defer to the legislative scheme. Given the comprehensiveness of the legislative treatment, it does not make sense, notwithstanding the framing of this case by the parties, for us to continue to rely on outdated and arguably inapplicable precedent. I would thus reverse the opinion of the court of appeals and remand this case directly to the district court, with instructions to grant the appellant standing to intervene for purposes of an adjudication of parentage pursuant to the Act, to conduct a full hearing on the equitable factors the Act sets forth, and to consider whether the appointment of a guardian ad litem is appropriate.